Filed 1/28/21  In re K.J. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re K.J., a Person Coming Under the Juvenile Court Law. | B302870 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JONATHAN J.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP04537A) |

APPEAL from order of the Superior Court of Los Angeles County, Steff Padilla, Juvenile Court Referee.  Remanded with directions.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Amir Pichvai for Plaintiff and Respondent.

————————————————

Jonathan J. (Father) appeals from the juvenile court's disposition order declining to place his 11-year-old son K.J. in his custody under Welfare and Institutions Code[1] section 361.2. Father argues the juvenile court erred by evaluating removal of K.J. under section 361, subdivision (c), rather than section 361.2, which applies to noncustodial parents, and failing to make the necessary findings regarding K.J.'s placement pursuant to section 361.2. We reverse the disposition order removing K.J. from Father and, if Father still desires custody of K.J., direct the juvenile court to reconsider Father's request for custody pursuant to section 361.2 in light of Father's and K.J.'s then-current circumstances. We otherwise affirm the disposition order.

**FACTUAL AND PROCEDURAL BACKGROUND**

K.J. was born in January 2010 to D.L. (Mother) and Father. Mother and Father married in 2011 and divorced in September 2015.

A.    *Prior Dependency Proceedings*

On November 13, 2012, the juvenile court sustained a petition under section 300, subdivision (b)(1), based on Mother's "mental and emotional problems, including suicidal ideation, suicide attempts, and a diagnosis of Mood Disorder NOS and ADHD." The petition further alleged that Mother's problems rendered her "incapable of providing regular care for [K.J.]." The petition also alleged that Father "knew of the mental and emotional problems of [Mother] and failed to protect [K.J.] in that [Father] allowed [K.J.] to reside in the [Mother's] home." The

_____

[1]    Statutory references are to the Welfare and Institutions Code.

juvenile court declared K.J. a dependent of the juvenile court and detained K.J. from his parents. The juvenile court ordered Mother to participate in individual counseling, submit to a psychiatric evaluation, and take all prescribed medication and ordered Father to obtain stable housing, complete individual counseling, and submit to a mental health evaluation. On June 27, 2014, because Mother and Father "did not make significant progress with the case plan[s]," the juvenile court terminated family reunification services. On October 23, 2014, the juvenile court terminated jurisdiction and placed K.J. in a permanent plan of legal guardianship with maternal aunt Janice T. and uncle Deondray W.

In 2014, Mother gave birth to K.C., and in 2015 she gave birth to K.L. On November 15, 2016, based on Mother's "history of mental and emotional problems," the juvenile court sustained a petition and detained K.C. and K.L. from Mother and presumed father Calvin C. In February 2018, the juvenile court terminated K.J.'s legal guardianship and ordered the Department to provide Mother with reunification services. In September 2018, the juvenile court terminated jurisdiction over K.J., K.C., and K.L. and granted Mother sole legal and physical custody of the children. Because of Father's "unknown whereabouts," the court granted him monthly monitored visitation with K.J.

B. *Current Dependency Proceedings*

1. *July 15, 2019 Incident and the Department's Investigation*

On July 15, 2019, after receiving a report of a "woman threatening to kill herself," sheriff's deputies responded to Mother's home. The deputies confiscated Mother's firearm along with ammunition and placed Mother on a 72-hour involuntary

3

hold pursuant to section 5150. The Department removed K.L. and K.C. from Mother's custody. K.J. was not present because he was visiting a relative. Once located, K.J. joined K.C. and K.L. in protective custody. Mother's cousin told the Department that Janice and Deondray were willing to care for the children. Janice and Deondray reported to the Department that K.J. "has been in their home for most of his life" and that they were willing to care for him again. After the Department's assessment, the Department cleared Janice for K.J.'s placement, but the Department did not clear Deondray.

On July 16, 2019, after Mother had been discharged from the hospital, Mother told the Department that, although she had expressed that "she wanted to die," "she did not say she was going to kill herself." Mother reported that she had been doing "very well with her mental health treatment" and that she was seeing "a therapist and psychiatrist" and taking prescribed medications. However, Mother stated that she felt "overwhelmed" by the recent death of maternal great aunt Valerie S. Mother told the Department that Father was not involved in K.J.'s life. In his July 17 interview with the Department, K.J. stated that Father lived in Las Vegas and that K.J. "went to visit him a while ago." K.J. told the social worker that "he want[ed] to go home, but he will always want to go" live with Janice and Deondray. K.J. asked the social worker "if she knew how long he had lived with them." Although K.J. had been diagnosed with ADHD, K.J. stated that he had "not taken medication for a long time" and that he no longer "had a hard time sitting still."

On July 17, 2019, the Department left Father a voicemail message requesting that he return the call.

4

### 2. *Dependency Petition and Detention Hearing*

The Department filed a petition on July 17, 2019 on behalf of K.L., K.C., and K.J. under section 300, subdivision (b). The petition alleged "[Mother] has mental and emotional problems, including suicidal ideation and a history of suicide attempts, a diagnosis of Mood Disorder NOS, which render [Mother] incapable of providing regular care of the children. . . . The children are prior Dependents of the Juvenile Court due to [Mother's] mental and emotional problems. Such mental and emotional problems on the part of [Mother] endanger the children's physical health and safety and place the children at risk of serious physical harm, damage and danger."

At the July 18 detention hearing, the juvenile court found a prima facie case for detaining the children from Mother and finding that the children were persons described by section 300. The juvenile court detained the children from Mother and placed them in the Department's temporary custody and care. As to K.L. and K.C., the juvenile court found it had "reason to believe those children are Indian Children under the Indian Child Welfare Act." The court set a jurisdiction hearing for August 12, 2019. On August 2, the Department sent Father a letter informing him of K.J.'s detention and the August 12 jurisdiction hearing. The Department placed the children with separate foster families.

### C. *Jurisdiction and Disposition Hearings*

### 1. *The Department's Reports*

During his interview in his foster home on August 6, 2019, K.J. "appeared to have difficulty focusing on the conversation" and he "often began to talk about unrelated information." K.J. denied hearing Mother express that she wanted to kill herself or

witnessing Mother engage in violent or abnormal behavior.  K.J. reported that, while living with Mother, his cousin Marquis "'whooped me with a belt and, one time, he picked me up by my shirt and he choked me."  K.J. stated that Mother was not at home "when Marquis whooped him."  K.J. stated that "Marquis used to live with him," but Marquis moved out.  According to K.J., Marquis also "whooped" K.C.  K.J. reported that maternal great aunt Valerie "whooped" and "popped" the children and that he thought about killing a teacher at his school.  During K.C.'s interview with the Department, when asked if Mother "would sometimes whoop [K.J.] with a belt, K.C. responded:  "No, she will always whoop us with a belt when she gets mad or we're doing bad stuff."  K.C. reported hearing Mother say, "I want to kill myself."  The Department reported that K.J. appeared to be "developing age-appropriately" and that K.J., K.C., and K.L. were "scheduled to be placed together in the home of maternal great cousin, Kristi [W.]" on August 8, 2019.  In response to a question about his needs, K.J. stated, "'To learn how to draw, me and my dad are the only artistic ones in the family.'"

During an August 6 interview, Mother stated that "she did not understand why her children were removed" from her custody.  Mother stated "she was involuntarily hospitalized even though she was not homicidal or suicidal."  Mother further reported that "she had a license for the gun because she had obtained it through her job as a security guard."  Mother stated that she "'had no idea" about Marquis "choking" K.J. and "whooping" the children.  Mother knew that Valerie "hit the children with an open hand on [their] hand[s]."  After Mother reported that "[K.C.] and [K.L.] were registered with the Salt River Pima-Maricopa Indian Community through [Calvin]," she

6

provided the Department the children's tribe registration numbers and advised that the tribe was involved in the previous dependency proceeding.

While Mother had allowed K.J. to visit with Father during their spring 2019 trip to Las Vegas, Mother reported: "[S]he stopped allowing [K.J.] to see [Father] because he did not follow through with the orders from the previous [dependency] case. [Mother] reported concerns about [Father's] mental health and explained that he had a sexual abuse history as a minor, where [Father] had been both a perpetrator and a victim." Mother also told the Department that Father had "disclosed that he had slept with his biological sister and that he was in love with her so [Mother] kept [K.J.] away from him by lying and saying that [K.J.] was occupied with other things when [Father] asked to see [K.J.]."

During an August 7 telephonic interview, Father reported that he had been living in Las Vegas for five or six years and that he shared a two-bedroom home with his wife and their two young children. Father also reported that there was a bed for K.J. in the children's room. Although he was not currently working and "was in his first year of college," Father stated that his wife was employed and that "he was using financial aid to cover bills." Father reported that he and his siblings "were raised in foster care, as a result of paternal grandfather sexually abusing them." Father denied having any mental illness, a criminal history, or a history of "sexual abuse as a perpetrator."

Father reported that he had prevented Mother from committing suicide "a couple of times." However, Father had not mentioned Mother's suicide attempts during the prior dependency proceeding because he did not want Mother to "look

7

bad." In retrospect, Father stated he would have disclosed Mother's previous suicide attempts if he had known "that this was going to be a pattern." Father stated, "[H]e didn't want [Mother] to be in jail or anything like that so [he] shut up.'" Father also stated that he thought Mother's mental health had "stabilized" because the juvenile court released K.J. to Mother's custody in 2018. Father reported that he had been involved in K.J.'s previous dependency case and that he had asked for custody of K.J.. However, according to Father, "[Mother] told her attorney that [Father] had been sexually abused by paternal grandfather and this was held against [Father]." Father added, "[H]e never gained custody of [K.J.] because his history as a sexual abuse victim was continuously held against him." Father also reported that "even though he was a non-offending parent" and the juvenile "court never ordered him to do anything," "he voluntarily participated in a parenting class through his church."

Father reported speaking with K.J. consistently between October 2018 and May 2019. However, when Valerie "passed away, there's been like a different side to [Mother] where [Father was] just kind left out of the loop." Although Father he did not "want to badmouth" Mother, Father "was willing to do anything to gain custody of [K.J.]." Father stated: "'[He was] just sad that it took this long to get [K.J.] and under these circumstances.'" Father also reported that he and K.J. "'don't communicate that much because [Mother] usually tells [Father] she's at work'" when Father calls to speak with K.J. Father reported that, when he called Mother on July 31 to speak with K.J., Mother had "made it seem like everything was okay" and that she had not informed Father about the current dependency proceeding.

8

Father reported he had last seen K.J. in May 2019[2] when Mother and her three children traveled to Las Vegas to visit K.J.'s maternal grandmother after Valerie's death. Father stated that during their visit, Mother was "drinking, crying, and . . . talking about ending her life." Father stated: "'The reason [he] didn't take it too extreme was because her aunt had just passed away so [he] didn't judge her for that.'" Father told the Department: "[D]uring this visit to Las Vegas, [K.J.] said he wanted to live with [Father] but, when [Father] talked to [Mother] about it, she got upset and said that [K.J.] could not live with [Father] because [Father] had not gone to court to fight for custody." When asked what specifically K.J. had said about "preferring to live with [Father] over [Mother]," Father stated: "He said [he] don't feel safe. [He] want[ed] to live with [Father]. [He] just want to stay with [Father]. [K.J.] was basically crying his heart out and . . . he explained to [Father] that [Mother] had talked about suicide a few times and [K.J.] didn't like it." Father stated that "he wanted [K.J.] to remain in his care but [Father] did not have legal custody and did not want to get charged with kidnapping."

Father told the Department that, because he lived in Las Vegas, he would not be able to attend the August 12 hearing. The Department provided Father with information for him to contact K.J. and participate in the August 12 hearing. As to Father, the Department concluded: "[I]t appears that [Father] was not forthcoming regarding his criminal history and sexual abuse history as a perpetrator, as [Father's] CLETS results

---

[2] Mother testified that her trip to Las Vegas took place in March 2019, rather than in May.

indicate hits for sexual crimes as a minor. Given this information and the concerns expressed by [Mother] during previous court proceedings, the Department believes it would be in the best interest of [K.J.] for [Father] to participate in parenting classes, a mental health evaluation and individual counseling, as previously ordered; [Father] to participate in all recommended treatment including medication compliance." The Department recommended that the juvenile court detain the children from their parents, declare them dependents of the juvenile court, and place them under the Department's care and custody.

2. *August 2019 Jurisdiction Hearings*

At the August 12 hearing, the juvenile court confirmed that Father had contacted the court. After finding "good legal cause to continue the matter over Mother's strenuous objection" so that Father could speak with his counsel, the juvenile court confirmed that the children "are now in an [ICWA] compliant home and they are together." At the continued hearing on August 19, 2019, after Father's counsel stated that Father was "interested in placement and Father was "non-offending on this petition," the juvenile court continued the jurisdiction hearing to August 26, 2019. At the August 19 hearing during a discussion with the court, Mother stated: "[I]t came to my attention out of his mouth that [Father] had sex with his own sister, cheated on his new wife with his own sister. He was kicked out the house. After I learned that, I kept [K.J.] away from [Father]." The juvenile court responded: "I understand that Ma'am. I'm not returning [K.J.] to [Father]. What I'm indicating to you, Ma'am, is [Father] has a right to have an attorney just like you do. [Father's] attorney was just appointed this morning. . . . I'm not giving [K.J.] to his Father. . . . He had a right to be present. He ha[s] a

10

right to have an attorney and be prepared for trial. . . . I'm doing a very, very short turnaround for [Father's] attorney to be present, and we will be going forward on that next date.  Okay.  I just wanted to explain to you why I was doing what I was doing.  Okay."  On August 22, 2019, Father advised the Department that he would be unable to attend the August 26 hearing.

At the August 26 jurisdiction hearing, Mother testified about her mental health history, the incident on July 15, her visit to Las Vegas with the children, and the progress with her case plan.  After pointing out that Father was nonoffending on the petition, Father's counsel waived argument at the hearing.  The children's counsel submitted on the Department's recommendation.  The juvenile court sustained the petition under section 300, subdivision (b), declared K.J. a dependent of the court,  and ordered K.J. to remain placed with his relative under the Department's supervision.  After Father's counsel stated that Father and K.J. were "having some phone contact," the juvenile court ordered the Department to provide an update regarding Father's visits with K.J. for the next hearing.  The juvenile court scheduled the disposition hearing for October 3, 2019.  In a last minute information for the court filed on October 3, 2019, the Department stated that Father had not visited K.J. since his removal from Mother.

3.    *October 2019 Disposition Hearing*

At the October 3, 2019 contested disposition hearing, after Mother testified and introduced evidence in support of her progress with the case plan.  Father's counsel argued:  "[Father] was interviewed for the jurisdiction report in which he indicated he was seeking custody.  He's non-offending in this petition, and I don't believe that there really has been a serious effort to assess

11

whether or not release to Father would be appropriate at this time.  He does live in Las Vegas. . . . I don't believe that there's sufficient evidence to not release—I don't believe there's significant evidence of a detriment under 361.2 to avoid releasing [K.J.] to Father at this point.  I do understand the Department in the jurisdiction report was concerned about a sex crime that is in Father's CLETs from when he was a juvenile; however, Father was approximately 14 years old at the time of that incident, and the current reports have no information about any of the substance of that matter.  Father . . . has made efforts to be in contact with the child.  He's noncustodial.  He's non-offending.  I believe that absent a count pleaded against the Father absent evidence of detriment that we have to release [K.J. to Father]."  Counsel for the children submitted on the Department's recommendation.

The juvenile court found that "return of the children to the care, custody, and control of . . . the parents places the children at imminent risk of physical and emotional harm.  The court's going to order removal. . . . And that's to [M]other and as to the fathers.  The juvenile court's October 3 minute order stated:  "The Court finds by clear and convincing evidence, pursuant to     . . . sections 361(a)(1), 361(c), 361(d), and 362(a), and additionally applying to noncustodial parent(s)/legal guardian(s) the constitutional and statutory safeguards available to custodial parents. [¶] It is reasonable and necessary to remove the child from the **parents** . . . because there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being . . . of the child, and there are no reasonable means by which the child's physical health can be protected, without removing the child from the home and the care, custody, and control of that or

12

those parent(s)/legal guardian(s). [¶] The Court further finds that it would be detrimental to the safety, protection, or physical or emotional well-being . . . of the child to be returned to or placed in the home or the care, custody, and control of that or those parent(s)/legal guardian(s)." The juvenile court did not mention section 361.2 at the hearing or in its minute order.

The juvenile court ordered Mother and Father to enroll in parenting classes and individual counseling and "take all prescribed psychotropic medications." The court further ordered monitored visitation for Father and "unmonitored visitation in placement" for Mother. The juvenile court scheduled a six-month review hearing (§ 366.21, sub. (e)). The juvenile court found that K.C. and K.L. were Indian children under ICWA. The juvenile court determined that K.J. was not an Indian child under ICWA. Father did not attend the hearing.

On August 28, 2020, at Father's request, the juvenile court continued the six-month review hearing to September 17, 2020 for a contest regarding K.J.'s "release" to Father.[3] The juvenile court ordered Father "to make himself available for possible testimony." At the September 17 six-month review hearing, Father withdrew his request for a contested hearing. After finding Mother's and Father's progress with their case plans had "not been substantial," the court scheduled an 18-month permanency review hearing (§ 366.22) for January 15, 2021. At the hearing on January 15, 2021, the juvenile court terminated Mother's and Father's reunification services and scheduled a

---

[3] We take judicial notice of the juvenile court's August 28, 2020, September 17, 2020, and January 15, 2021 minute orders pursuant to Evidence Code sections 452, subdivision (d), and 459.

13

section 366.26 selection and implementation hearing for April 12, 2021.  Because Father withdrew his request for a contested hearing on September 17, 2020, it is unclear whether Father is still seeking custody of K.J.

Father timely appealed the October 3 disposition order.

## DISCUSSION

A.  *Substantial Evidence Did Not Support The Juvenile Court's Order*

1.  *Applicable Law*

Section 361, subdivision (c), authorizes the court to remove a child from "the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated [if] the juvenile court finds clear and convincing evidence [that] . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' . . . physical custody."

Section 361.2, in contrast, is not a removal statute.  (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1422.)  Rather, section 361.2 governs placement of a child after the dependency court has acquired jurisdiction of a child, and "evinces the legislative preference for placement with the noncustodial parent when safe for the child."  (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262.)  Section 361.2, subdivision (a), provides:  "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of

14

Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Section 361.2, subdivision (c), provides: "The court shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)." The detriment standard, "while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member. [¶] We do not get ideal parents in the dependency system. But the fact of the matter is that we do not get ideal parents anywhere." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789; accord, *In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.)

A court's ruling that a child should not be placed with a noncustodial parent requires the finding of detriment to be made by clear and convincing evidence. (See *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827-1828 ["[a] parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood"]; *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1243 ["[t]he noncustodial 'parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of

15

the child"'"]; *In re Henry V.* (2004) 119 Cal.App.4th 522, 530 ["[d]ue process requires the findings underlying the initial removal order to be based on clear and convincing evidence"].) "We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that . . . the child[ ] would suffer such detriment." (*In re Luke, supra,* 107 Cal.App.4th 1412, 1426; accord, *In re Patrick S., supra,* 218 Cal.App.4th at p. 1262.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

The court in *In re Marquis D., supra,* 38 Cal.App.4th 1813 explained the importance of the clear and convincing standard for the section 361.2 detriment finding: "Here, we do not deal with the termination of parental rights but rather with the denial of placement with a noncustodial parent. However, the trial court's decision at the dispositional stage is critical to all further proceedings. Should the court fail to place the child with the noncustodial parent, the stage is set for the court to ultimately terminate parental rights. At all later review hearings, the court may deny return of the child to the parent's physical custody based on a finding supported only by a preponderance of the evidence that return would create a substantial risk of detriment to the child's physical or emotional well-being. [Citations.] [¶] If a preponderance of the evidence standard of proof is applied to deny initial placement with the noncustodial parent, that parent may have his or her parental rights terminated without the

16

question of possible detriment engendered by that parent ever being subjected to a heightened level of scrutiny. Moreover, applying a clear and convincing standard of proof to remove custody from the custodial parent while denying placement with the noncustodial parent based on a preponderance of the evidence would lead to the anomalous result that a parent who had no connection with the circumstances that brought the child within the jurisdiction of the court could have his or her rights terminated upon a lesser showing than the parent who created those circumstances." (*In re Marquis D.,* at p. 1829; see *In re C.M.* (2014) 232 Cal.App.4th 1394, 1401-1402.).

### 2. *Substantial Evidence Did Not Support a Detriment Finding*

K.J. did not reside with Father at the time the events or conditions arose that brought K.J. within the provisions of section 300. And Father made clear he wanted custody of K.J. Therefore, the juvenile court had an obligation under section 361.2, subdivision (a), to place K.J. with Father unless the court found by clear and convincing evidence that placement with Father would be detrimental to K.J.'s safety, protection, or physical or emotional well-being. (See *In re C.M., supra,* 232 Cal.App.4th at p. 1401 ["[t]o comport with due process, the detriment finding must be made under the clear and convincing evidence standard"].) Father argues the juvenile court "unmistakably erred in applying section 361, not section 361.2" to Father's request for custody. Father also argues that "this is not the 'clear-cut case' in which detriment can be implied under section 361.2, requiring remand to the juvenile court for a new disposition hearing." The Department argues that "the record does not support Father's contention that the court did not apply

Section 361.2 to him" because "the language in the [October 3, 2019] minute order mirrors the language in Section 361.2, subdivision (a)." The Department further argues that, even if the juvenile court "did not apply Section 361.2 to the Father, such error was harmless as the evidence of detriment required by the statute was 'clear' in this case."

We agree with the Department that, although the juvenile court did not reference section 361.2, the court included language in its minute order that arguably tracks the language of section 361.2.[4] Further, there was no question that the court made a "substantial danger" finding under section 361, subdivision (c), as to Father. Because it is questionable whether there is any substantive difference between the standards in section 361, subdivision (c), and section 361.2, subdivision (a),[5] substantial

---

[4] As stated, the October 3, 2019 minute order provided: "The Court finds by clear and convincing evidence, pursuant to . . . sections 361(a)(1), 361(c), 361(d), and 362(a), and additionally applying to noncustodial parents(s)/legal guardian(s) the constitutional and statutory safeguards available to custodial parents. [¶] . . . [¶] The Court further finds that it would be detrimental to the safety, protection or physical or emotional well-being . . . of the child to be returned to or placed in the home . . . of . . . those parent(s)/legal guardian(s)."

[5] As stated, section 361, subdivision (c) permits the juvenile court to remove a child from a parent's custody only if it finds clear and convincing evidence of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home . . . ." (§ 361, subd. (c).) Section 361.2 requires placement with a noncustodial parent "unless [the court] finds [by clear and convincing evidence]

18

evidence to support removal under section 361, subdivision (c), would almost certainly equate to a finding of detriment under section 361.2, subdivision (a). (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303 ["we can neither ignore the similarity between these statutes' mandatory findings, nor disregard the evidence supporting the court's 'substantial danger' finding concerning placement with father"].) However, reversal is nonetheless required because substantial evidence did not support a detriment finding under section 361.2.

Although the Department had the burden to establish detriment and the "nonoffending parent does not have to prove lack of detriment" (*In re C.M.*, *supra*, 232 Cal.App.4th at p. 1402; *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1256), the Department submitted virtually no evidence concerning Father's competence as a parent, his ability to provide for K.J.'s needs, or other factors that might support a finding that placing K.J. with Father would be detrimental to K.J. There was a paucity of information about how Father's background, including his juvenile criminal conviction, might impact his ability to parent K.J. The Department did not conduct an investigation regarding Mother's accusation about Father's alleged inappropriate sexual conduct. There was no information regarding the nature and extent of reunification services Father had completed during the prior dependency proceeding or the basis for the juvenile court's order granting Mother sole legal and physical custody of K.J. Nor was there information regarding K.J.'s relationship with

that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

19

K.C. and K.L.  Rather, the Department recommended that the juvenile court detain K.J. from Father based on his criminal record and Mother's accusations.  However, while Father had not visited K.J. during the current dependency proceeding, K.J. had expressed a desire to live with Father and had confided in Father regarding Mother's problems.  Mother admitted that she impeded Father's contact with K.J.  In any event, "[a]n 'alleged lack of a relationship between [a] father and [a child] is not, by itself, sufficient to support a finding of detriment for purposes of section 361.2, subdivision (a).'" (*In re Adam H.* (2019) 43 Cal.App.5th 27, 32-34; see *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1086 ["'where a child has a fit parent who is willing to assume custody, there is no need for state involvement unless placement with that parent would create a substantial [risk] of detriment to the child'"]; *In re Patrick, supra,* 218 Cal.App.4th at p. 1263 ["[w]hen the parent is competent, the standard of detriment is very high"].)

Given the lack of information about the factors that might support a finding that placing K.J. with Father would be detrimental to K.J., substantial evidence did not support such a finding under section 361.2, subdivision (a).  (*In re K.B.* (2015) 239 Cal.App.4th 972, 980 [mother failed to provide clear and convincing evidence that placement of child with father was detrimental to child where father could provide "safe, healthy, and happy home"]; *In re Patrick S., supra*, 218 Cal.App.4th at p. 1263 [agency did not prove by clear and convincing evidence placement of child with father in Washington State would be detrimental to child where father was "competent, caring and stable parent," even though child was anxious about moving to live with father and father was scheduled to deploy with the

20

Navy].)

Therefore, we reverse the disposition order. On remand, if Father still desires custody of K.J., the juvenile court is to reconsider placement of K.J. pursuant to section 361.2 based on the facts existing at the time of the proceeding. (See *In re Abram L., supra*, 219 Cal.App.4th at p. 464, fn. 6 ["[o]n remand the juvenile court must make a decision based on the facts existing at the time of the further proceedings"].)

## DISPOSITION

The disposition order denying Father's request for placement of K.J. with him is reversed. On remand, if Father still desires custody of K.J., the juvenile court is to reconsider that request pursuant to section 361.2 in light of Father's and K.J.'s then-current circumstances. In all other respects, the disposition findings and order are affirmed.

DILLON, J.[*]

We concur:

PERLUSS, P. J.          FEUER, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.